**Cary B. LEWIS, Plaintiff,**

v.

**CHICAGO STATE COLLEGE et al., Defendants.**

**No. 68 C 1963.**

United States District Court N. D. Illinois, E. D.

March 19, 1969.

Mitchell Ware, Mazza, Mazzio & Ware, Chicago, Ill., for plaintiff.

Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

DECKER, District Judge.

The plaintiff Lewis is a Negro associate professor at Chicago State College, an Illinois college supported by public funds. In 1967 and 1968, the Department of Business Education recommended that he be promoted to full professor, but the appropriate faculty committee and the school's administration declined to do so.

Lewis has now instituted this civil rights action, claiming that the college and its governing officers discriminate against Negro faculty members in violation of 42 U.S.C. §§ 1983 and 1985(3). Plaintiff asks this court to promote him to a full professorship and to require the school to allow him to participate in the administration and various faculty committees. In response, the defendants have moved for summary judgment, alleging that the failure to promote Lewis resulted solely from an evaluation of his ability. Since the record contains no evidence of racial discrimination, defendants are entitled to judgment as a matter of law.

### I. Background

Promotions and salary increases at Chicago State College originate with the instructional departments, which submit proposals to the APTS faculty committee. After reviewing the departmental recommendations, the committee forwards its suggestions to the President. Similarly, the President screens the proposals and then presents his recommendations to the Board of Governors which makes the final decision.

In May 1967 the APTS committee suggested that the plaintiff and four white associate professors be promoted to full professor. The President returned all five recommendations, urging the committee "to examine criteria for such promotions * * * and also to study the issues relating to appropriate number and percentage of full professors." Shortly thereafter, the committee resubmitted two of the original recommendations, but Lewis was not one of the two.

The next year, in the spring of 1968, the APTS committee's recommendations did not include Lewis, although they successfully recommended that another Negro associate professor be promoted to full professor.

### II. Racial Discrimination

The college's President and all five members of the 1967 and 1968 APTS committee declare that their actions con-

cerning Lewis were unrelated to his race. According to the affidavits, plaintiff's race was never mentioned. Rather, "while Professor Lewis was a valuable member of the faculty he did not meet the criteria established by the APTS Committee and the President of the College for elevation to full professor."

Accepting the truth of plaintiff's three opposing affidavits establishes only that: (1) 1967 was the first time a Negro had been recommended for promotion to full professor, (2) the President's referral back to the APTS committee in 1967 was novel, and (3) the APTS committee's refusal to adopt the Department of Business Education's promotion recommendations in 1967 and 1968 was also unprecedented.

█ Although the complaint implies that all faculty members must be treated equally, universities justifiably distinguish among teachers who hold different academic ranks. Lewis has been an associate professor for six years and has been at the college for eleven years. Of the other forty-one associate professors, seven have been associate professors for as long or longer than the plaintiff, and five have been employed by the school for more than eleven years. In fact, one associate professor has been with Chicago State College for fifteen years and has been in his present rank for nine years. All of these faculty members are white.[1]

With respect to salary, Lewis objects because his 1967 and 1968 raises were less than those recommended by his department. Of the associate professors now at the college, however, only three receive a larger salary than plaintiff and twenty-seven receive less. Furthermore, of those who have smaller salaries, four have served longer as associate professors and two have been employed longer by the college. Each of these teachers is white.[2]

As for faculty and administrative committees, Lewis served as Budget Coordinator for the college in 1966 and had the responsibility for integrating the college's entire budget. He voluntarily resigned this position in 1967. Plaintiff has also served on five other committees: the graduation, student activity fees, faculty welfare, athletic, and McKelvey Report committees.[3] The latter issued a comprehensive analysis of the school's future development.

### III. Justiciability

█ The judiciary is not the appropriate forum for decisions involving academic rank. A professor's value depends upon his creativity, his rapport with students and colleagues, his teaching ability, and numerous other intangible qualities which cannot be measured by objective standards. As stated in Application of Lombardi, 18 A.D.2d 444, 240 N.Y.S.2d 119, 120–121 (App.Div.1963):[4]

"[P]romotions in the advanced academic ranks are not determined solely by lapse of time and record qualifications consisting of advanced degrees

---

1. Presently, twenty-five of the 297 faculty members are Negro, with two full professors out of thirty-nine, two associate professors out of forty-five, fourteen assistant professors out of 119, three instructors out of seventy, and four faculty assistants out of twenty-four.

2. Moreover, Lewis' 1967 monthly salary increase was exceeded by only two other associate professors, out of a total of thirty-two associate professors then with the college. In 1968, plaintiff's raise was exceeded by only eight of the other teaching associate professors.

3. In addition, faculty committee membership is determined by the faculty Senate,

rather than by the defendants (the President and the administration).
Plaintiff does not allege that he ever attempted to become chairman of his department, an honor which is also bestowed by the faculty members of the department.

4. Two associate professsors claimed they were not promoted because of religious discrimination. The court granted summary judgment, explaining that:
"[N]ot only do the allegations not make out a case, but if they did, then from this time few qualified candidates could be denied judicial relief upon any failure to promote." 240 N.Y.S.2d 123.

and written works. They [plaintiff] admit that the more elusive qualifications of teaching ability, administrative capacity and creative inspiration are relevant.

\* \* \* \* \* \*

"It should be readily evident that such qualifications are not mechanically measurable nor susceptible to visual comparison with conclusive result."

*Compare* Daly v. Pedersen, 278 F.Supp. 88, 90 (D.Minn.1967). Since the courts are not qualified to make such evaluations,[5] judicial review is only proper if the plaintiff can clearly demonstrate illegal discrimination.

## IV. *Conclusion*

■ The record lacks any evidence of racial prejudice against the plaintiff. Promotion decisions appear to have been made on ability, not race. Of two other Negroes who have been promoted to full professor, one attained this distinction at the same time the APTS committee declined to recommend Lewis. Plaintiff's recent salary increases were among the highest at the college, and he now enjoys salary at the high end of the scale. He has served both as a member of the administration and on responsible faculty committees.

■ Moreover, promotion decisions made by a college's faculty, administration and governing board are not normally justiciable. These determinations depend upon evaluations of intangibles such as scholarship, teaching ability, service to the profession, and potential contribution to the institution. A full professorship may not be obtained solely by long tenure, good behavior, or the accumulation of academic degrees. Instead, it is the highest honor a university can confer upon a colleague.

Accordingly, I have today entered an order granting summary judgment for the defendants.

5. *Compare* Donnelly v. United States, 134 F.Supp. 635, 636, 133 Ct.Cl. 120, 122 (1955), in which the Court of Claims refused to interfere with the military's failure to promote an enlisted man. See also Johnson v. United States, 280 F.2d 856, 858, 150 Ct.Cl. 747, 751 (1960).